UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN ANTHONY TRACY,

                    Plaintiff,                            Civil Action No. 11-cv-15107

           v.                                   District Judge Mark A. Goldsmith
                                               Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 13]**

Plaintiff Kevin Tracy brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 12, 13; *see also* Dkt. 14), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 4).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that substantial evidence supports the Administrative Law Judge's decision that Plaintiff was not disabled prior to the expiration of his insured status. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II.  REPORT

### A.  Procedural History

On January 13, 2009, Plaintiff filed an application for DIB asserting that he became unable to work on September 1, 2007.  (Tr. 10.)  The Commissioner initially denied Plaintiff's disability application on May 3, 2009.  (*Id.*)  Plaintiff then filed a request for a hearing, and on September 8, 2010, he appeared with a non-attorney representative before Administrative Law Judge ("ALJ") Mary Ann Poulose, who considered the case *de novo*.  (Tr. 27-59.)  In an April 26, 2011 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 10-18.)  The ALJ's decision became the final decision of the Commissioner on September 14, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on November 17, 2011.  (Dkt. 1.)

### B.  Background

Plaintiff was 42 years old on his alleged disability onset date.  (*See* Tr. 139.)  Plaintiff has been married for nearly 20 years, and has two teenage sons.  (Tr. 319.)  He has an eleventh-grade education (Tr. 240), and has past work primarily as a truck driver.  (Tr. 165).

#### 1.  Plaintiff's Testimony at the Hearing Before the ALJ

At the administrative hearing before ALJ Poulose, Plaintiff primarily testified about his difficulties controlling his anger and resulting bouts of rage.  Plaintiff described an incident where his son would not obey his wife: "He wouldn't listen, and I went upstairs, and I told him, I said, get in your room, he started crying.  I was like what are you crying for like a little baby, and he told me to shut up.  I lost it, that fast."  (Tr. 45.)  Plaintiff said he blacked out because he was so angry, and, when he emerged from that state, he had a broken hand and could not remember how it occurred (he

had punched his son's bed). (Tr. 42.) As another example, Plaintiff described an incident at a concert:

> [I] [w]as at a concert, and a man hit me in the back of the head on accident, he said sorry . . . . [Later,] the man bumped into me again, and I politely snatched him up by the front of his shirt, and slammed him up against the phone about 20 times. And I said you won't hit me again, will you?

(Tr. 49.) He also described an incident at his son's football practice:

> Last night . . . I went to my son's football practice, and I was standing by the equipment shed, standing my ground, not doing anything, and I was eating some sunflower seeds, and a guy walked by bumped me, and I could feel it starting, I can't do this, you know, not in front of all these kids. I just wanted to reach around and hit him. What did you hit me for, I was just standing here? Why would you bump into me, there's all kinds of room on this side, and all kinds of room on this side. I was like no, I held my ground, one of my buddies walked up. Hey man, let's take a walk down and go talk to, you know, go talk to the varsity coach. Okay. I got out of there. I had to get away . . . . I wanted to hit that man, because there was absolutely no reason for him to bump into me.

(Tr. 49.) Plaintiff testified that, at one point, he would visualize himself "slash[ing] people's throats [or] popping their eyeballs out of their head" when he got angry. (Tr. 51.) He stated, however, that he had not had that type of anger since seeing his present therapist and psychiatrist. (Tr. 40-41, 51.) Plaintiff also testified that sometimes he is able to avoid an altercation or a fit of rage by walking away from a situation, "bury[ing]" himself at his computer, or playing a video game. (Tr. 41.)

Plaintiff also testified regarding his anger in work situations. Plaintiff worked for a number of different companies as a truck driver. He expressed that most of the trucking companies would try to force him to work more hours than what was permitted by law. (Tr. 33.) He told the ALJ, "I don't do that. I'm sorry, you're not making me work more than I'm allowed, not getting me in trouble just because your customer needs a load, sorry, law is law." (Tr. 34.) On at least one

3

occasion the practice led to an altercation with his supervisor where Plaintiff wanted to be physical, "but I'm on one side of the counter, he's on the other, [and] there was no way I was getting in." (*Id.*) Plaintiff stated that, save two, he had been fired from every job he had held in the past ten years. (Tr. 35.)

Plaintiff offered limited testimony about physical problems. He provided that after sleeping at night his feet made it difficult for him to walk down stairs. (Tr. 39.) He suggested, however, that the problem did not linger. (*Id.*) He stated that he has no problems taking care of his personal needs (bathing, dressing). (Tr. 37.) Regarding cooking, Plaintiff provided, "It's not that there's a physical problem, it's I'm not doing that. I'm not helping [my wife with that]." (Tr. 37-38.) He did not testify to whether he could sweep, vacuum, mow the lawn, or shop; instead he provided that those were tasks that were his children's chores or tasks performed by his wife. (Tr. 38.) He acknowledged that he could carry a 24-can case of soda from the car into the house. (*Id.*)

Plaintiff testified that he takes a number of medications: Depakote (used to treat mania),[1] Prozac (used to treat depressive or obsessive thoughts),[2] Synthroid (for hypothyroidism), Xanax

---

[1]Valproic acid, the general name for Depakote, "is used alone or with other medications to treat certain types of seizures. Valproic acid is also used to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods)." AHFS Consumer Medication Information, *Valproic Acid*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/ (last visited June 27, 2012).

[2]"Fluoxetine (Prozac) is used to treat depression, obsessive-compulsive disorder (bothersome thoughts that won't go away and the need to perform certain actions over and over), some eating disorders, and panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)." AHFS Consumer Medication Information, *Fluoxetine*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/  (last visited June 27, 2012).

(used to treat anxiety disorders),[3] Simvastin (used to treat high cholesterol), Ropinirole (for his restless leg syndrome), and Vicodin (apparently for his headaches or shoulder and neck pain). (Tr. 39-40, 184.) He reported that he experienced sleepiness from his medication, but, since he began taking his Depakote at night, he did not nap as often during the day. (Tr. 40.) He also reported "[a] little nausea once in a while" but suggested that the nausea was not an issue if he ate or drank milk prior to taking his medication. (*Id.*)

2. *Medical Evidence*

A point of law helps frame the presentation of the medical evidence. To be eligible for DIB, not only does a claimant need to show that he was disabled by his alleged onset date, he must also establish that he became disabled prior to the expiration of his insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); 20 C.F.R. § 404.130; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). In this case, Plaintiff's date last insured ("DLI") is September 30, 2008. Accordingly, the Court divides its presentation of the medical evidence between those records created before September 30, 2008 and those created after. The latter set of records "is only minimally probative" but "may be considered to the extent it illuminates a claimant's health before the expiration of his insured status." *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (table), 1999 WL 777355, at *1 (6th Cir. 1999) (citing *Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Higgs*, 880 F.2d at 863)); *see also Swartz v. Barnhart*, 188 F. App'x 361, 369-70 (6th Cir. 2006).

---

[3]"Alprazolam is used to treat anxiety disorders and panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks)." AHFS Consumer Medication Information, *Alprazolam*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000807/ (last visited June 27, 2012).

*(a) Records Related to Plaintiff's Physical Impairments Created Before Plaintiff's Insured Status Expired on September 30, 2008*

On April 3, 2007, Plaintiff saw Dr. Rafia Haque, his primary care physician, for the first time in two years. (Tr. 191.) It appears that the purpose of the visit was for Dr. Haque to fill out paperwork. (*Id.*) Plaintiff also complained of "tenderness" at the base of his neck. (*Id.*) Dr. Haque's notes indicate that, in May 2006, Plaintiff had injured his big toe and a podiatrist prescribed Vicodin ES. (*Id.*) Dr. Haque then remarked, "He tells me he takes Vicodin ES once every few months for headaches[;] he still gets headaches very often, deals [with] it [and] does not take Vicodin ES." (*Id.*)

On May 1, 2008, Plaintiff returned to Dr. Haque. (Tr. 192; *see also* Tr. 299.) Plaintiff told Dr. Haque that he had undergone a psychiatric evaluation in April 2008. (Tr. 192.) Plaintiff also reported that, over the prior six to eight months, his left leg would shake or move. (*Id.*) Dr. Haque diagnosed myoclonus (muscle twitching), anxiety neurosis, and bipolar depression. (*Id.*)

In August and October 2008, Dr. Haque's office left messages with Plaintiff to schedule an appointment. Plaintiff was not seen again by Dr. Haque until November 6, 2008.

*(b) Records Related to Plaintiff's Physical Impairments Created After Plaintiff's Insured Status Expired on September 30, 2008*

On November 6, 2008, Plaintiff saw Dr. Haque for a cholesterol check and preventative healthcare appointment. (Tr. 193.) Plaintiff complained of difficulty urinating. (*Id.*) Dr. Haque did not note headaches or leg shakes. (*Id.*)

In December 2008, Dr. Haque diagnosed hyperlipidemia, insomnia, and hypothyroidism. (Tr. 194; *see also* Tr. 292.)

In or around November 2009 Plaintiff was diagnosed with sleep apnea. (Tr. 288-89, 291.)

6

He was prescribed a CPAP machine.  (*See* Tr. 275, 280-81.)

In December 2009, Plaintiff reported pain in his feet.  (Tr. 282-87.)  The symptoms were worse when he walked.  (Tr. 282.)  Dr. John Evans, a podiatrist, diagnosed bilateral metatarsalgia (pain and inflamation in the ball of the foot), severe pes cavus (very high arch), bilateral metatarsal adductus (forefoot twisted inwards relative to the hindfoot), and bilateral gastroc equinus (tightness in outer calf muscle).  (Tr. 282, 285.)

In April 2010, Plaintiff returned to Dr. Haque.  (Tr. 273.)  Plaintiff reported that he had been able to sleep well with marijuana use but he had stopped using marijuana.  (*Id.*)  He also reported that his feet and legs jerked at night.  (*Id.*)

In May 2010, Plaintiff fractured his fifth metacarpal in his right hand.  (Tr. 259, 329-30, 335-36.)

In June 2010, Plaintiff saw Dr. Haque for a checkup.  (Tr. 266.)  Dr. Haque diagnosed muscle tension headaches and restless leg syndrome.  (*Id.*)  It appears that Plaintiff requested Vicodin ES, and Dr. Haque prescribed it.  (Tr. 266-267.)

On August 3, 2010, Dr. Haque completed a residual functional capacity assessment.  (Tr. 263-64.)  He provided that Plaintiff was unable to work any occupation.  (Tr. 263.)  He further provided that Plaintiff had a medical need to lie down four times per day for a half-hour each time, and to rest three to four times per day for a half to one hour each time.  (Tr. 264.)  Dr. Haque justified these limitations by explaining, "[patient's] neck and shoulder pain gets worse [such] that he has to take Vicodin ES and rest."  (Tr. 264.)  Oddly, however, Dr. Haque provided that Plaintiff could sit for five hours, stand for one to two hours, and walk for two hours in an eight hour workday.  (Tr. 263.)  In a section of the form requesting a summary of Plaintiff's medical disposition and

requesting clinical and objective findings, Dr. Haque provided, "46 year old male [with history of] mood disorder and bipolar [disorder] and depression[.] [S]tates he could not keep any job for more than six months because of attitude [and] mood problems." (Tr. 264.)

> *(c) Records Related to Plaintiff's Mental Impairments Created Before Plaintiff's Insured Status Expired on September 30, 2008*

It appears that Plaintiff saw Dr. Michael Gotlib, a psychiatrist, for the first time in July 2007. (Tr. 252.) Plaintiff denied suicidal or homicidal ideation, and his behavior, judgment, and thought content were normal. (*Id.*) Dr. Gotlib diagnosed bipolar disorder with a history of alcohol dependence. (*Id.*) He refilled Plaintiff's medications (Prozac, Seroquel, and Depakote) and recommended therapy and alcoholic's anonymous. (*Id.*)

On April 14, 2008, Plaintiff completed a mental-health screening and intake form for the Insight Recovery Center. (Tr. 244-47, 250-51.) He rated his current health as "good" – the second highest on a five-point scale. (Tr. 250.) Plaintiff explained that "physically" he felt "ok" but also indicated frequent and severe headaches and numbness in his legs and feet. (*Id.*) Plaintiff reported bipolar related symptoms, moodiness, depression, anxiety, suicidal thoughts, and thoughts of hurting others. (Tr. 244; *see also* Tr. 249.) The therapist also quoted Plaintiff as stating that his "I don't give a f*** attitude" prevented him from meeting his goals. (Tr. 244.) Plaintiff was diagnosed with bipolar disorder and assigned a GAF score of 45. (*Id.*)[4] The therapist recommended once-a-week

---

[4]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF score of 45 to 50 reflects "serious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school

sessions for 20 weeks.  (*Id.*)

On April 15, 2008 Plaintiff went to the emergency room for a psychiatric assessment.  (Tr. 198.)  Plaintiff reported that he was depressed but denied wanting to hurt himself or others.  (*Id.*)  The diagnosis was bipolar affective disorder.  (*Id.*)  Plaintiff was discharged as stable and to follow up with a "Dr. Mahr."  (*Id.*)

On July 3, 2008, Plaintiff returned to Dr. Gotlib at the Insight Recovery Center.  Plaintiff's chief complaint was "I have bipolar disorder."  (Tr. 240.)  Plaintiff reported mood swings, irritability, poor concentration, and fatigue.  (Tr.  240.)  Dr. Gotlib found that Plaintiff was cooperative, had "intact" memory and judgment, and had normal thought content and thought process. (Tr. 241.)  Plaintiff's affect was constricted and mood depressed, however.  (*Id.*)  Plaintiff apparently had homicidal thoughts in May 2008.  (Tr. 241.)  Dr. Gotlib provided that Plaintiff had a history of bipolar disorder and alcohol dependence.  (Tr. 242.)  He decreased Plaintiff's Seroquel prescription and continued Prozac and Depakote, and recommended therapy and alcoholic's anonymous/narcotics anonymous.  (*Id.*)

> *(d)  Records Related to Plaintiff's Mental Impairments Created After Plaintiff's Insured Status Expired on September 30, 2008*

On October 9, 2008, Plaintiff had a followup visit with Dr. Gotlib.  (Tr. 239.)  Plaintiff provided that he was eating and sleeping well and had a better mood.  (*Id.*)  He denied suicidal or homicidal ideation.  (*Id.*)  Dr. Gotlib refilled medication, recommended therapy, and recommended alcoholics anonymous/narcotics anonymous.  (*Id.*)

In December 2008, Dr. Gotlib noted that Plaintiff was doing well and had no current

---

functioning (e.g. no friends, unable to keep a job)."  *DSM-IV* at 34.

complaint. (Tr. 238.) He maintained diagnoses of history of bipolar disorder, history of alcohol dependence. (*Id.*) He again refilled medication and recommended therapy and alcoholics anonymous/narcotics anonymous. (*Id.*)

On April 28, 2009, Plaintiff was discharged from the Insight Recovery Center. (Tr. 236) The discharge summary provides that Plaintiff had an admission GAF score of 45 but a discharge GAF score of 50. (*Id.*) Plaintiff also reported lower anger levels, a more stable mood, and decreased stress levels. (*Id.*)

On May 4, 2009, Rose Moten-Solomon completed a Psychiatric Review Technique form for the Social Security Administration. (Tr. 206-19; *see also* Tr. 220-33.) Ms. Moten-Solomon provided that there was insufficient evidence of an impairment prior to the September 2008 DLI. (Tr. 206.)

From July 7, 2009 to September 29, 2009, Plaintiff resumed treatment at the Insight Recovery Center. (Tr. 235.) The discharge summary provides, "Client resumed treatment due to reported family and relationship concerns[.] Client reported [decreased] stress and anger levels as he worked and helped to resolve conflict [with] family [and] friends." (*Id.*) Plaintiff's GAF score at discharge was 53. (*Id.*)

In May 2010, Plaintiff sought treatment at The Guidance Center. (Tr. 321-25.) He reported that he had "fired" his prior psychiatrist because that psychiatrist would not monitor Plaintiff's Depakote blood levels. (Tr. 321.) Plaintiff reported recurrent suicidal thoughts and seeing violent images. (Tr. 321.) He denied current suicidal thoughts. (*Id.*) Dr. Eric Kubrak at The Guidance Center completed a psychiatric evaluation. (Tr. 320.) Dr. Kubrak noted that Plaintiff had a "long standing [history] of mood dysregulation" and a history of "labile mood swings with little

provocation." (Tr. 318.)  He noted that Plaintiff was "currently in a cast" because, according to Plaintiff, he became irate and punched a futon when his son took a swing at him and told him to "shut up." (Tr. 318.)  Upon completing a mental-status exam, Dr. Kubrak noted,

> Somewhat in contradiction to review of the chart, [patient] presented in a somewhat calm and docile manner. [Patient] is personable, pleasant throughout the entire interview.  He showed no indication for propensity for aggression or violence however did indicate he could change very rapidly with minor provocation.  No delusional content.  No response to internal stimuli.  No [homicidal or suicidal] ideation, plan or intent[;] however[,] [patient] does have a pattern of chronic, passive suicidal thoughts that have been present essentially a good portion of his life. [Patient] is oriented to person/place/time and appears to be grossly cognitively intact and of average or higher intelligence.

(Tr. 319.) Kubrak diagnosed "Bipolar Disorder versus a variation of Schizoaffective Disorder," and "[p]olysubstance abuse versus dependency with current remitted state." (Tr. 319.) Kubrak assigned a GAF score of 40-45.  (Tr. 319.)

On August 3, 2010, a therapist at The Guidance Center provided that Plaintiff's mood was generally "good [and] stable."  (Tr. 313.)  The therapist noted that Plaintiff had "more interaction with [wife] and children."  (*Id.*)

### 3. Vocational Expert's Testimony at the Hearing Before the ALJ

The ALJ asked the VE to consider a person of Plaintiff's age, education, and work experience who was limited to unskilled work "with the no public [interaction] and the only occasional co-worker [interaction]." (Tr. 54.) The VE testified that at the "medium" exertion level, there would be work as a hand packer and laundry worker, each with more than 1,000 jobs available in Michigan. (Tr. 54-55.) The VE further testified that at the "light" exertion level, the hypothetical individual could work as a small parts assembler or housekeeper, each with more than 1,000 jobs

11

available in Michigan.   (Tr. 55.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

12

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since September 1, 2007 — Plaintiff's alleged onset date.  (Tr. 12.)  At step two, the ALJ found that Plaintiff had the following severe impairment: bipolar disorder.  (*Id.*)  Next, the ALJ concluded that, through the DLI of September 30, 2008, this impairment did not meet or medically equal a listed impairment.  (Tr. 13-15.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "a full range of work at all exertional levels but with the following nonexertional limitations: occasional coworker interaction and no public interaction or group tasks."  (Tr. 15.)  At step four, the ALJ found that Plaintiff could perform his past relevant work as a truck driver.  (Tr. 18.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative

13

proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).   Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*,

14

486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

Plaintiff raises three claims of error on appeal. First, says Plaintiff, the ALJ erred at step two of the five-step disability determination process by failing to find that his "muscle tension/stress headaches and restless leg syndrome" were "severe" impairments. (Dkt. 12, Pl.'s Mot. Summ. J. at 10-11.) Next, Plaintiff claims that the ALJ's residual functional capacity assessment does not accurately portray his physical and mental limitations. (*Id.* at 12-17.) Third, Plaintiff argues that substantial evidence does not support the ALJ's step-four determination that he could return to his past work as a truck driver. (*Id.* at 18-19.) The Court has carefully considered these claims of error, and, for the reasons that follow, finds that none warrant remand or reversal of the ALJ's decision.

### 1.  *Plaintiff Has Not Shown that the ALJ Reversibly Erred at Step Two*

Plaintiff says, "The ALJ rendered an improper Step 2 determination by failing to find that Plaintiff suffered from severe physical impairment of muscle tension/stress headaches and restless leg syndrome prior to the date last insured of September 30, 2008 despite a de minimis threshold." (Pl.'s Mot. Summ. J. at 10.) Plaintiff is correct that, in this Circuit, "the claimant's burden of proof at step two 'has been construed as a de minimis hurdle in the disability determination process . . . . [A]n impairment can be considered *not* severe only if it is a slight abnormality that *minimally* affects work ability regardless of age, education, and experience.'" *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 774 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). The problem with Plaintiff's de minimis argument, however, is that, in this case, there is also de minimis evidence of headaches and restless leg syndrome prior to Plaintiff's DLI.

15

There is only one medical record dated before September 30, 2008 discussing headaches. On April 3, 2007 – having not seen Dr. Haque in two years – Plaintiff reported that he had tenderness at the base of his neck and that, "once every few months," he took Vicodin ES, prescribed by his podiatrist, for headaches. (Tr. 191.) Although Plaintiff also told Dr. Haque that he "gets headaches very often," Plaintiff qualified the statement by providing that he is able to deal with the pain without taking Vicodin ES. (*Id.*) It does not appear that Dr. Haque prescribed any medication for Plaintiff's headaches. The record reflects that Plaintiff did not again report headaches or neck tension until June 2010. (Tr. 266.) The ALJ did not unreasonably conclude that one complaint over a three-year period, for which Plaintiff did not seek immediate treatment and Plaintiff's physician did not immediately treat, failed to evidence that Plaintiff's headaches had a material impact on the "abilities and aptitudes necessary to do most jobs." *See* 20 C.F.R. § 404.1521. The opposite conclusion may also be reasonable, but this does not mean that the ALJ reversibly erred. *See Germany-Johnson*, 313 F. App'x at 774 ("The question in this appeal thus becomes whether there is also substantial evidence to support the opposite conclusion — that the claimant's impairments are so slight that they have little, if any, impact on her work capacity. If substantial evidence supports the decision of the administrative law judge, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." (internal quotation marks and citation omitted)).

Plaintiff resists this conclusion by arguing that his statement about not taking Vicodin frequently does not reflect that his headaches were not severe; Plaintiff says that the statement instead reflects the severity of his mental impairments. (Pl.'s Mot. Summ. J. at 11.) But Plaintiff offers no record evidence in support of this theory. Nothing suggests that Plaintiff's bipolar disorder

16

was such that it prevented him from taking pain medication.  Plaintiff points to a statement about a distrust of medications.  (*Id.*)  But this statement was from May 2010 (three years after the April 2007 appointment) and referred to side effects of psychiatric medication.  (Tr. 319.)  Moreover, even if Plaintiff's theory is plausible, so is the opposite: that Plaintiff's mental impairments did not preclude him from seeking treatment for his headaches.  The ALJ did not unreasonably find that Plaintiff's pre-DLI records (or lack thereof) evidenced that Plaintiff's headaches had a de minimis affect on his ability to perform "basic" work activities.

Plaintiff next argues that the ALJ erred in finding that his restless leg syndrome was not a severe impairment.  (Pl.'s Mot. Summ. J. at 11-12.)  Plaintiff points to a May 1, 2008 medical record.  There, Plaintiff reported to Dr. Haque that he noticed that his left leg had been shaking or moving over the past six to eight months.  (Tr. 192.)  Haque, however, did not diagnose restless leg syndrome; instead, he diagnosed "myoclonus" (involuntary muscle jerk).  (Tr. 192.)  It was not until June 2010 that Dr. Haque diagnosed restless leg syndrome.  (Tr. 266.)  Further, it does not appear that Dr. Haque prescribed any medication in May 2008 (or prior to Plaintiff's DLI) for Plaintiff's leg twitch; this in contrast to Plaintiff's Ropinirole prescription for restless leg syndrome at the time of the administrative hearing.  (Tr. 39-40, 184.)  Moreover, Plaintiff, apparently experiencing muscle twitching for six to eight months, delayed in seeking medical treatment.  While other conclusions may be drawn, the Court finds nothing unreasonable about the ALJ's conclusion that — prior to the DLI — Plaintiff's left-leg shakes did not materially intefere with basic work activities (e.g., walking, standing, and sitting).  *See* 20 C.F.R. § 404.1521.

In sum, Plaintiff has not shown that the ALJ reversibly erred at step two of the five-step

disability process.[5]

### 2. Plaintiff Has Not Shown that the ALJ's RFC Assessment Lacks Substantial Evidentiary Support

Plaintiff argues that the ALJ's residual functional capacity ("RFC") assessment is inaccurate in two ways. (Pl.'s Mot. Summ. J. at 12.) Relying on Dr. Haque's August 2010 opinion, Plaintiff argues that the ALJ was required to include greater physical limitations in the RFC assessment. Plaintiff then relies on his testimony and other medical evidence to show that the ALJ erred in omitting greater mental limitations. (*Id.* at 12-17.) The Court considers these claims of error in turn.

Plaintiff begins by asserting that "it is improper for an ALJ to give absolutely no weight to a treating physician's opinion" (such as Dr. Haque's August 2010 opinion). (Pl.'s Mot. Summ. J. at 13.) But Plaintiff cites no case law supporting a bright-line rule that precludes an ALJ from completely rejecting a treating-source opinion. The case law is to the contrary. *Cf. Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433 (6th Cir. 2012) ("Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record."); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 806 (6th Cir. 2011) ("The agency's treating-source rule permits an ALJ to reject a

---

[5]Even if the ALJ erred by not finding Plaintiff's headaches and restless leg syndrome severe impairments, Plaintiff has not taken the further step of showing how the ALJ's error warrants remand or reversal. In particular, it is not harmful error for an ALJ to exclude an impairment as severe at step two, where, as here, the ALJ finds other severe impairments and then considers the excluded impairment at subsequent steps of the disability process (e.g., in crafting a claimant's residual functional capacity assessment). *See Swartz v. Barnhart*, 188 F. App'x 361, 368 (6th Cir. 2006) ("Even assuming that the ALJ erred by not including 'Borderline Intellectual Functioning' and 'Dependent Personality Disorder' as additional severe impairments in step two of its analysis, the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's impairments in determining her residual functional capacity."); *Riepen v. Comm'r of Soc. Sec.*, 198 F. App'x 414, 415 (6th Cir. 2006).

18

treating source's opinion if substantial evidence in the record contradicts it.").

Plaintiff also presents a more tempered version of this argument. Plaintiff cites the Sixth Circuit's opinion in *Blakley v. Comm'r of Soc. Sec.* for the following proposition: "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." 581 F.3d 399, 406 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1527(d)(2). The Court does not quarrel with the rule that (if assigning something less than controlling weight) an ALJ is required to *consider* the factors set forth in 20 C.F.R. § 404.1527(d)(2) to determine how much weight to assign a treating-source opinion. But the explanatory requirement associated with the treating source rule does not require an ALJ to explicitly *discuss* each and every one of these factors in his narrative. *Francis v. Comm'r Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011). Rather, an ALJ must give "good reasons" for the weight assigned a treating-source opinion:

> To be sure, it would have been preferable for the ALJ to have explicitly discussed each of the 20 C.F.R. § 404.1527 factors in his narrative. However, it appears that the explanatory requirement that accompanies the treating source rule is not so demanding. The procedural rule requires an ALJ to "provide 'good reasons' for discounting treating physicians' opinions, reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting S.S.R. 96-2p, 1996 WL 374188, at *5). And while the Court of Appeals has stated that an ALJ must "apply," *Wilson*, 378 F.3d at 544, and "consider," *Rogers*, 486 F.3d at 242, the Section 404.1527 factors, Plaintiff has not cited, and the Court is not aware of, any binding authority requiring an ALJ to explicitly discuss each factor in his narrative. As explained by another district court in this Circuit, there may be occasions where

19

the ALJ has given the requisite "good reasons" for rejecting a treating-source opinion and has considered the 20 C.F.R. § 404.1527 factors without explicitly discussing each such factor:

> Plaintiff asserts that the ALJ erred in failing to specifically articulate how each of the [20 C.F.R. § 404.1527(d)] factors influenced the weight he ultimately chose to give [his treating source's] opinion. The Court disagrees. . . .

> Although [the ALJ] did not explicitly address each of the factors set forth in 20 CFR § 404.1527(d), he did state that he had "considered opinion evidence in accordance with the requirements" of that provision, he expressly addressed both the supportability and consistency factors in detail, and he made clear the weight he ultimately gave [the treating-source] opinion. The Court finds this sufficient to satisfy the procedural requirements of 20 C.F.R. § 404.1527(d). *See Ray v. Astrue*, No. 3:09-cv-275, 2010 WL 2650718, at *7 (E.D. Tenn. July 2, 2010) (finding that the ALJ did not err in focusing only on the supportability and consistency factors to decide that the treating physician's opinion was not entitled to controlling weight); *see also Wamsley v. Astrue*, No. 09-cv-02811-CMA, 2011 WL 334454, at *6 (D. Colo. Jan. 31, 2011) ("If a treating physician's opinion is not given controlling weight, the ALJ must 'give good reasons' and consider a list of regulatory factors. Though the ALJ must consider these factors, he need not discuss all of them."); *McCoy v. Astrue*, No. 4:09-cv-517-A, 2010 WL 5812954, at *4 (N.D. Tex. Dec. 16, 2010) (explaining that the ALJ must "'consider' each of the factors set forth in section 404.1527(d) and articulate good reasons for its decision to accept or reject the treating physician's opinion," but that he "need not recite each factor as a litany in every case"); *accord Bergner v. Astrue*, No. 3:09-cv-242, 2010 WL 2710591, at *4 (N.D. Ind. July 7, 2010).

*Paseka v. Comm'r of Soc. Sec.*, No. 1:09-CV-1073, 2011 WL 883701, at *1-2 (W.D. Mich. Mar. 11, 2011); *accord Klimas v. Comm'r of Soc. Sec.*, No. 1:10-cv-666, 2012 WL 691702, at *1 (W.D. Mich. Mar. 1, 2012) ("The ALJ is not required, however, to

explicitly discuss each of [the § 404.1527] factors.  Instead, the record must reflect that the ALJ considered those factors relevant to his assessment." (citing *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 F. App'x 448, 450 (5th Cir. 2007))).

*Blanchard v. Comm'r of Soc. Sec.*, 11-CV-12595, 2012 WL 1453970, at *16-17 (Mar. 16, 2012)

*report and recommendation adopted by* 2012 WL 1432589 (E.D. Mich. Apr. 25, 2012).

Thus, the Court turns to the particulars of this case.  Here, the ALJ provided the following justification for assigning Dr. Haque's opinion "no weight":

> As for the opinion evidence, Dr. Haque provided his opinion in the form of a "check mark" residual functional capacity assessment.  Dr. Haque's opinion is dated August 3, 2010; however, the claimant's date last insured is September 30, 2008.  The undersigned declines to give weight to Dr. Haque's opinion for several reasons.  First, the undersigned generally assigns little weight to "check mark" residual functional capacity assessment, unless the assessment is accompanied by a narrative explanation, which in this case is not.  Second, as discussed previously, the undersigned finds the claimant's physical impairments were either nonsevere or non-medically determinable impairments as of the claimant's date last insured.  Therefore, the undersigned assigns no weight to Dr. Haque's opinion regarding the claimant's physical limitations, as his opinion relates to physical impairments after the relevant timeframe.  Additionally, in terms of Dr. Haque's opinion regarding the claimant's limitations due to his mental impairments, Dr. Haque is the claimant's primary care provider, not his treating mental health doctor.  Dr. Haque's opinion regarding the claimant's inability to work forty hours a week also appears to be based on the claimant's reported limitations regarding his bipolar disorder, not an individualized assessment of the claimant's functioning.  Dr. Haque's opinion that the claimant cannot work forty hours a week is based on the claimant's statement that "he could not keep any job for more than six months because of attitude and mood problems." Exhibit 6F, page 3. Therefore, the undersigned assigns no weight to the residual functional capacity provided by Dr. Haque.

(Tr. 17.)

The Court finds that, collectively, these were "good reasons" for rejecting Dr. Haque's

21

August 2010 opinion.  Plaintiff faults the ALJ for characterizing Dr. Haque's opinion as a "check mark" form because the Social Security Administration's own consultants complete similar forms. (Pl.'s Mot. Summ. J. at 13.)  This is true.  But it is also true that one of the 20 C.F.R. § 404.1527 is the "supportability" of a physician's opinion: "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."  20 C.F.R. § 404.1527(c)(3).  Thus, the ALJ did not err as a matter of law. Moreover, the ALJ did not err as a matter of fact.  Dr. Haque's opinion is not well supported or explained.  In support of rather extreme limitations (i.e., the need to lie down four times per day for a half-hour each time and to rest three to four times a day for a half-hour to an hour each time) Dr. Haque provided: "[patient's] neck and shoulder pain gets worse [such] that he has to take Vicodin ES and rest."  (Tr. 264.)  Dr. Haque cited no testing.  Dr. Haque cited no exam records.  Moreover, earlier in his opinion, Dr. Haque provided that Plaintiff could collectively sit, stand, and walk for eight hours in an eight-hour workday.  (Tr. 263.)  No explanation reconciles these seemingly contradictory findings.

The Court also finds nothing unreasonable about the ALJ discounting Dr. Haque's opinion on the limiting effects of Plaintiff's mental condition.  (Tr. 17; *see also* Tr. 264.)  20 C.F.R. § 404.1527(c)(5) provides that "We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  Because it does not appear that Dr. Haque ever treated Plaintiff for his bipolar-related symptoms, it was entirely reasonable for the ALJ to conclude that "Dr. Haque's opinion that the claimant cannot work forty hours a week is based on the claimant's statement that 'he could not keep

any job for more than six months because of attitude and mood problems.'" (Tr. 17.)

The ALJ also buttressed the two reasons just discussed by further providing that (1) Dr. Haque's opinion was from August 2010, (2) Plaintiff's date last insured is September 30, 2008, and (3) Dr. Haque's "opinion relates to physical impairments after the relevant timeframe." (Tr. 17.) The ALJ's claim is supported by substantial evidence. As discussed above, there is limited evidence showing that Plaintiff's headaches and restless leg syndrome had any significant impact on Plaintiff's ability to work prior to September 30, 2008. Nothing in Dr. Haque's opinion — authored almost two years after Plaintiff's DLI — provides that the limitations he provided date back to before Plaintiff's DLI. *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (table), 1999 WL 777355, at *1 (6th Cir. 1999) ("Evidence relating to a time outside the insured period is only minimally probative, . . . but may be considered to the extent it illuminates a claimant's health before the expiration of his insured status." (citing *Siterlet*, 823 F.2d at 920; *Higgs*, 880 F.2d at 863)).

In sum, the Court finds that the ALJ reasonably rejected Dr. Haque's August 2010 opinion insofar as it established disabling limitations prior to September 30, 2008. It follows that the ALJ did not err in omitting Dr. Haque's limitations from his RFC assessment.

Plaintiff also claims that the ALJ "rendered an incomplete RFC determination that did not account for the severity of Plaintiff's mental impairments." (Pl.'s Mot. Summ. J. at 14.) At step three of the five-step disability determination process, the ALJ found that Plaintiff had "moderate" limitations in social functioning. In support of his claim that he suffers from more than moderate limitations in social functioning, Plaintiff points to (1) two letters completed by his psychiatrist and therapists, (2) his testimony, and (3) a pair of GAF scores. The letters, however, were first submitted to the Appeals Council. As they were not before the ALJ, the Court may not consider

23

them in deciding Plaintiff's appeal.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline*

*v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

As for his testimony, Plaintiff points to his statements about blackouts, and four specific

incidents of rage or anger: the incident where he punched furniture and broke his hand, an incident

where he wanted to hurt a friend, the incident at his son's football practice, and the incident where

he repeatedly slammed an individual against a phone at a concert.  (Pl.'s Mot. Summ. J. at 15.)

Plaintiff says, "[c]learly these are not the symptoms of an individual who suffers only 'moderate'

limitations in social functioning."  (Pl.'s Mot. Summ. J. at 15.)

But Plaintiff's testimony also indicates that, prior to the DLI, his anger may have been more

manageable.  Of the four incidents cited by Plaintiff, only one, the concert incident, was even

arguably before September 30, 2008.  And Plaintiff did not specify when his anger-induced

blackouts began.  (Tr. 42.)  Further, Plaintiff's angry, violent visions did not manifest until after the

DLI: he testified that he was not having the visions until he treated at the Guidance Center which

was in 2010.  (Tr. 50; *see also* Tr. 41.)  Although Plaintiff testified to being fired from eight of ten

jobs, he also testified that he worked at a trucking company for a year before he quit (because the

trucks frequently broke down).  (Tr. 46.)  Plaintiff also testified to altercations at a truck driving job

he held from April to September 2007.  (Tr. 33.)  But he was not ultimately fired for those

altercations; he testified that he failed to timely deliver a load and was then fired.  (Tr. 33.)  Plaintiff

also testified "I drink maybe three or four social occasions.  Sometimes it's excessive, sometimes

it's one.  Just depending how . . . the evening's going. If people are having a good time, I want to

have a good time with them too."  (Tr. 44.)  Finally, in his self-completed function report, Plaintiff

provided that, on a daily basis, he plays games online "with some interaction with others," picks up

24

his sons from their practices, and sometimes goes to their sporting events. (Tr. 153.)

As a whole, Plaintiff's testimony does not demonstrate that the ALJ unreasonably concluded that Plaintiff had only moderate limitations in social functioning prior to his DLI. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."). Moreover, even if Plaintiff's social-functioning limitations were more severe, e.g., "marked," Plaintiff has not shown that the ALJ's RFC assessment is in error. The ALJ limited Plaintiff to no group tasks, no interaction with the public, and only occasional interaction with coworkers. (Tr. 15.)

Plaintiff also points out that, upon admission at the Insight Recovery Center in April 2008, his GAF score was 45 and, at discharge in April 2009, he was assigned a similar score of 50. (Dkt. 14, Pl.'s Resp. to Def.'s Mot. Summ. J. at 4.) A GAF score of 45 to 50 reflects "serious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM-IV* at 34. The low GAF scores are therefore troubling. But ultimately, the meaning of the scores is too ambiguous to demonstrate that the ALJ unreasonably excluded further social functioning limitations in her RFC assessment of Plaintiff.

"A GAF score may help an ALJ assess mental RFC, but it is not raw medical data." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). In particular, "according to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning." *Id.* at 511; *see also DeBoard v. Comm'r of Soc. Sec.*,

211 F. App'x 411, 415 (6th Cir. 2006).  Further,

> GAF scores . . . are measures of both severity of symptoms *and* functional level. [*Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (Text Revision, 4th ed. 2000)]. Because the "final GAF rating always reflects the worse of the two," *id.* at 33, the score does not reflect the clinician's opinion of functional capacity.  Accordingly, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir. 2003) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

*Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

In this case, it is not apparent that Plaintiff was assigned a GAF score of 45 in April 2008 because of serious impairments in social functioning.  At that time, the therapist noted that along with self isolation (a symptom clearly relevant to social functioning), Plaintiff had depression, melancholy, sad affect, nervousness, anxiety, hopelessness, and decreased motivation.  (Tr. 249.)  Plaintiff also reported suicidal thoughts.  (Tr. 244.)  Similarly, at discharge in April 2009, Plaintiff was given a GAF score of 50 but, along with anger, the discharge summary mentions mood swings, anxiety, and stress.  (Tr. 236.)  It is likely that the combination of these symptoms justified the therapist's GAF score.  It is therefore ambiguous as to whether the therapist believed that Plaintiff's social functioning, standing alone, justified scores in the 45 to 50 range.  The ALJ explicitly noted both scores, and, thus, considered them in crafting Plaintiff's RFC.  (Tr. 17.)  Under the deference owed to the ALJ's assessment, Plaintiff has not demonstrated reversible error.

Moreover, even granting that the therapist opined that Plaintiff had a "serious impairment in social . . . functioning," *DSM-IV* at 34, it is not apparent that the ALJ did not adequately account for such symptoms.  Again, the ALJ limited Plaintiff to no group tasks, no interaction with the public, and only occasional interaction with coworkers.  While additional limitations might be

26

justified, these limitations are not unreasonable for someone with even a serious impairment in social functioning.

Finally, Plaintiff argues that the ALJ's RFC assessment is inaccurate because it does not "adequately account for Plaintiff's marked problems in concentration, persistence, or pace." (Pl.'s Mot. Summ. J. at 16.) In support of this claim, Plaintiff relies on the two just-discussed GAF scores and evidence submitted for the first time to the Appeals Council. (Pl.'s Mot. Summ. J. at 16.) Other than to note that the GAF scores even more tenuously reflect serious concentration problems (than serious social functioning problems), the Court will not restate its analysis regarding this evidence. Additionally, Plaintiff asserts that "a July 3, 2008 report found Plaintiff as having poor concentration." (*Id.* (citing Tr. 240).) But the Commissioner correctly points out that this was a self-reported symptom. (Def.'s Mot. Summ. J. at 18.) Dr. Gotlib never confirmed this complaint, and, while not explicitly testing for concentration, Dr. Gotlib instead found that Plaintiff's speech was "normal," his memory "intact," his judgment "intact," his thought process "normal," and insight "good." (Tr. 240-42.) In fact, among the evidence this Court may consider, it does not appear that any therapist or medical professional tested for, let alone found, that Plaintiff had any concentration problems during the insured period. In his self-completed function report, Plaintiff reported reading the news and emails online and playing online games on a daily basis. (Tr. 153.) Further, although he noted concentration problems, when asked how long he was able to pay attention, Plaintiff responded, "depends if I have interest." (Tr. 154.) In short, the Court does not find that the ALJ unreasonably excluded a specific concentration, persistence, or pace limitation from the RFC assessment based on single complaint in July 2008.

In sum, the testimony and evidence does not show that it was unreasonable for the ALJ to

27

have crafted Plaintiff's RFC in the manner that she did.  Plaintiff has therefore not shown reversible error.

### 3. *The ALJ's Error at Step Four Was Harmless*

Lastly, Plaintiff argues that substantial evidence, in particular VE testimony, does not support the ALJ's step-four determination that he could return to his past work.  (Pl.'s Mot. Summ. J. at 18.)  Plaintiff correctly argues that, in response to a hypothetical about an individual limited to "no public interaction and very little co-worker interaction," the VE testified that the individual would not be able to perform Plaintiff's past work as a truck driver or machine operator.  (Tr. 54.)  Plaintiff also correctly argues that in response to a hypothetical about an individual who was limited to unskilled work with no public interaction and only occasional co-worker interaction, the VE testified to jobs that differed from Plaintiff's past work.  (Tr. 54-55.)

But the Commissioner is correct that, while demonstrating error, Plaintiff has not shown reversible error.  In particular, the Commissioner aptly argues,

> Although it is true that the ALJ erred in stating that the VE testified that a person with Plaintiff's RFC could perform his past relevant work, Plaintiff has identified harmless error.  A remand on the basis of this error would be fruitless because the VE found a large number of other jobs Plaintiff could have performed with his RFC (Tr. 55). Even if the ALJ had not erred, she would have found Plaintiff not disabled.

(Def.'s Mot. Summ. J. at 18-19.)

In responding to this argument, Plaintiff does not contest the Commissioner's claim that the VE found other jobs Plaintiff could perform.  (Dkt. 14, Pl.'s Resp. to Def.'s Mot. Summ. J. at 5.)  Instead, Plaintiff focuses on the fact that the RFC assessment was inaccurate:

> Finally, the ALJ's Step 4 conclusion was not supported by the VE's testimony.  (Pl.'s Br. 16-17).  Defendant concedes this, but argues it

28

> was "harmless error" because the "VE found a large number of other
> jobs" available. (Def.'s Resp. 18-19).   However, had the ALJ
> properly incorporated Plaintiff's mental and physical impairments
> into the RFC, particularly those of treating physician Dr. Haque, all
> employment would be precluded.

(*Id.*)  The Court has already addressed the RFC argument and found that it does not justify remand

or reversal.  Accordingly, the Court finds that the ALJ's step four error was harmless in this case.

### G.  Conclusion

For the foregoing reasons, this Court finds that substantial evidence supports the ALJ's

decision that Plaintiff was not disabled prior to the expiration of his insured status.  Accordingly,

this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that

Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of

42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation

within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*,

474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and

Recommendation.   *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal

quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case

Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies,

through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon

this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  July 13, 2012

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 13, 2012.

s/Jane Johnson
Deputy Clerk